ACCEPTED
14-14-00421-CR
FOURTEENTH COURT OF APPEAL
HOUSTON, TEXAS
2/22/2015 3:49:51 PM
CHRISTOPHER PRIN
CLERK

**NO. 14-14-00421-CR**

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
2/23/2015 10:32:00 AM
CHRISTOPHER A. PRINE
Clerk

**IN THE COURT OF APPEALS
FOR THE FOURTEENTH SUPREME JUDICIAL DISTRICT
OF TEXAS AT HOUSTON**

_____

**REBECCA VICTORIA HUMARAN**

**APPELLANT**

**VS.**

**THE STATE OF TEXAS**

**APPELLEE**

_____

**APPELLANT'S BRIEF**

**ORAL ARGUMENT REQUESTED**

Crespin Michael Linton
440 Louisiana, Suite 900
Houston, Texas 77002
Texas Bar No. 12392850
(713) 236-1319
(713) 236-1242 (Fax)

# LIST OF PARTIES

The Appellant is Rebecca Victoria Humaran.

The Appellant's trial counsel is Juan Guerra & Leira Moreno Gracia.

The Appellant's appellate counsel is Crespin Michael Linton.

The Trial Judge is The Honorable Patrick Sebesta.

The appellate attorney representing the State is David Bosserman, Assistant District Attorney, Brazoria County, Texas.

# TABLE OF CONTENTS

List of Parties     i

Table of Contents     ii

Table of Citations     vi

Preliminary Statement     1

Statement of Facts     1

Pretrial Hearing – August 20, 2013     1

A. Defense's Witness     1

    1. Phillip Steven Roberts     1

Trial Phase     2

A. State's Witnesses     2

    1. Brent Waisner     2

    2. Samantha Scoggin     3

    3. Ray Rubio     4

4. Summer Warren      6

5. David Hallimore      7

6. David Beaver      9

7. Matt West      12

8. Jack Gentry      13

9. Peter Marsh      15

10. Shane Windsor      15

11. Mike Thomas      16

12. Amy Smuts      17

13. Jennifer Moreno      18

14. Juan Rojas      19

15. Chris Kincheloe      20

16. Stephen Pustilnik      22

17. Steven Roberts      24

18. Varon Snelgrove      24

19. Crockett Robinson      26

20. Stephanie Robinson      28

B. Defense's Witnesses      29

1. Brent Waisner      29

2. Samantha Scoggin      30

3. Ray Rubio     31

4. Jerome Griffin     31

5. Jack Gentry     31

6. Chris Kincheloe     32

7. Karen Humaran     32

C. Jury's Verdict     33

**Punishment Phase**     **33**

A. State's Witnesses     33

1. Chris Kincheloe     33

2. Steve Roberts     34

3. Ben Devine     35

4. Heather Bailey     35

5. Michael McCann     36

6. Christine Coronado     37

B. Defense's Witnesses     38

1. Cheri Schultz     38

C. Jury's Sentence     39

Points of Error                                              40

Point of Error Number One                                    42

Argument and Authorities on
    Point of Error Number One                          42

Point of Error Number Two                                    48

Argument and Authorities on
    Point of Error Number Two                          48

Point of Error Number Three                                  51

Argument and Authorities on
    Point of Error Number Three                        51

Point of Error Number Four                                   55

Argument and Authorities on
    Point of Error Number Four                         55

Point of Error Number Five                                   59

Argument and Authorities on
    Point of Error Number Five                         59

Point of Error Number Six                                    61

Argument and Authorities on
    Point of Error Number Six            61

Point of Error Number Seven            64

Argument and Authorities on
    Point of Error Number Seven            64

Point of Error Number Eight            67

Argument and Authorities on
    Point of Error Number Eight            67

Conclusion            72

Certificate of Compliance            72

Certificate of Service            72

# TABLE OF CITATIONS

## CASES

**Balentine v. State,** 71 S.W.3d 763
(Tex. Crim. App 2002)……………………………… 51

**Brooks v. State,** 323 S.W.3d 893
(Tex. Crim. App. 2010)…………..………………… 42

**Davis v. State,** 329 S.W.3d 798
(Tex. Crim. App. 2010)…………..………………… 42

**Fuentes v. State,** 991 S.W.2d 267, 275
(Tex. Crim. App 1999)……………………………… 57

**Gomez v. State,** 380 S.W.3d 830, 834
(Tex. Crim. App. 2013)……………………………… 62

**Granger v. State,** 3 S.W.3d 36, 38
(Tex. Crim. App. 1999)……………………………… 61

**Hayden v. State,** 296 S.W.3d 549
(Tex. Crim. App. 2009)……………………………… 65

**Illinois v. Gates,** 462 U.S. 213, 236-37
103 S.Ct. 2317, 2331, 76L.Ed.2d 334 (1983)……    52

**Jones v. State,** 833 S.W.2d 118, 123
(Tex. Crim. App. 1992)…………………………    53

**Jones v. State,** 944 S.W.2d 642, 647
(Tex. Crim. App. 1996)…………………………    43

**Matson v. State,** 819 S.W.2d 839, 846
(Tex. Crim. App. 1991)…………………………    42

**McCarty v. State,** 257 S.W.3d 238, 239
(Tex. Crim. App. 2008)…………………………    64

**Ngo v. State,** 175 S.W.3d 738, 743
(Tex. Crim. App. 2005)…………………………    61

**Porter v. State,** 634 S.W.2d 846, 849
(Tex. Crim. App. 1982)…………………………    48

**Ransom v. State,** 920 S.W.2d 288, 302
(Tex. Crim. App. 1994)…………………………    48

**Rayford v. State,** 125 S.W.3d 521, 528

(Tex. Crim. App. 2003)…………………………………… 52, 68

**Renteria v. State,** 206 S.W.3d 689
(Tex. Crim. App. 2006)…………………………………… 59

**Romero v. State,** 800 S.W.2d 539, 543
(Tex. Crim. App. 1990)…………………………………… 51, 68

**Serrano v. Jordan,** 123 S.W.3d 57, 60
(Tex. App. – Austin 2003, pet. ref'd)…………………… 53

**State v. Dixon,** 206 S.W.3d 587, 590
(Tex. Crim. App. 2006)…………………………………… 68

**State v. Jordan,** 342 S.W.3d 565, 568
(Tex. Crim. App. 2011)…………………………………… 53

**State v. Stone,** 137 S.W.3d 167, 174
(Tex. App. - Houston [1st Dist.] 2004, pet. ref'd)……… 52

**Vela v. State,** 209 S.W.3d 128
(Tex. Crim. App. 2006)…………………………………… 69

**Wicker v. State,** 667 S.W.2d 137
(Tex. Crim. App. 1984)…………………………………… 43

**Wyatt v. State,** 23 S.W.3d 18, 27
(Tex. Crim. App. 2000)……………….……………. 69

**Willingham v. State,** 897 S.W.2d 351, 359
(Tex. Crim. App. 1995)……………………………… 65

## STATUTES

Tex. Code Crim. Proc., Art.18.01 (West 2014)……………….. 52

Tex. Pen. Code §7.02 (West 2014)…………………………….. 48

Tex. Pen. Code §8.05 (West 2014)…………………………….. 62

Tex. Pen. Code §9.22 (West 2014)…………………………….. 62

Tex. Pen. Code §19.02 (West 2014)………………………….. 43

Tex. Rules of Evid., Rule 401 (West 2014)…………………… 65

Tex. Rules of Evid., Rule 402 (West 2014)…………………… 65

Tex. Rules of Evid., Rule 702 (West 2014)…………………… 68

<u>**PRELIMINARY STATEMENT**</u>

On August 1, 2012, Appellant Rebecca Victoria Humaran was arrested for the murder of Clinton Sutton, Sr.  On May 20, 2014, a jury found Humaran guilty of Murder.  On May 23, 2014, a jury assessed a sentence of 50 years in the Texas Department of Criminal Justice.  Appellant Humaran perfected her appeal on May 23, 2014.  (TR. Vol. 3 at 165)

<u>**STATEMENT OF FACTS**</u>

# PRETRIAL HEARING – AUGUST 20, 2013

On August 20, 2013, the trial court conducted a pretrial hearing on Appellant's Motion To Suppress Search Warrants for Defendant's DNA and for her Cell Phone.

**A.    Defense's Witness**

**1.    Phillip Steven Roberts**

Brazoria County Sheriff's Department Investigator Phillip Steven Roberts testified he prepared the affidavits for the search warrants for Appellant's DNA and for her cell phone. (R.R. Supp. at 6-7)   Roberts explained that he spoke to witnesses and reviewed police officers' reports to prepare the 2 search warrants.  (R.R. Supp. 1 at 9)  He stated that he

1

prepared the search warrant for Appellant's DNA after collecting the evidence on July 31, 2012. (R.R. Supp. at 9-10) Roberts testified that he spoke with Captain Kincheloe and other officers who stated that Appellant had handled a firearm. (R.R. Supp. at 12-15) He admitted that he did not have specific knowledge that Appellant handled a MAK-90 firearm. (R.R. Supp. at 16) Roberts testified that he prepared an affidavit on August 10, 2012, for the search warrant for Appellant's cell phone. (R.R. Supp. at 18-19) He admitted that he did not have any knowledge on whether or not the cell phone contained evidence for this case. (R.R. Supp at 20)

The trial court denied Appellant's Motion To Suppress the 2 search warrants. (R.R. Vol. Supp. at 27)

## TRIAL PHASE

### A. State's Witnesses

#### 1. Brent Waisner

Brent Waisner testified that he lives with Samantha Scoggin who is divorced from the deceased, Clinton Anthony Sutton, Sr. "Tony," and who is the mother of Clinton Sutton, Jr. (R.R. Vol. 3 at 45) Waisner acknowledged that he is currently on probation for the felony of Theft. (R.R. Vol. 3 at 44) He stated that on July 31, 2012, after he had drunk

2

three 16 ounce beers, he and Scoggin drove to Tony's farm in Jones Creek, Texas, to visit her son and ex-husband. (R.R. Vol. 3 at 46) Waisner testified that they arrived at 8:00 a.m. and saw Sutton, Jr., and Appellant standing on a concrete slab attached to the building while black smoke billowed from a nearby fire on the property. (R.R. Vol. 3 at 54) He explained that Sutton, Jr., and Appellant looked annoyed at their arrival and then saw Appellant wash blood from the concrete slab with a water hose after Sutton, Jr., whispered into Appellant's ear. (R.R. Vol. 3 at 58) Waisner testified that he remained in the car after Scoggin exited the car and followed her son into the building. (R.R. Vol. 3 at 62) He stated that Sutton ordered them to return in 45 minutes.

Waisner testified that when he and Scoggin returned that Sutton, Jr., ordered his mother to get back in the car and leave. (R.R. Vol. 3 at 72) He stated that a nude Appellant exited the building and threatened to call the police if they refused to leave the property. (R.R. Vol. 3 at 73) He explained that he and Scoggin did not call the police because they had been drinking and driving. (R.R. Vol. 3 at 79)

### 2. Samantha Scoggin

Samantha Scoggin testified that Sutton, Jr., began living with Tony in May of 2012, after he was discharged from the Marine Corps with less

3

than an honorable discharge. (R.R. Vol. 3 at 88) Scoggin stated that Appellant moved in with Sutton, Jr., and Tony in May of 2012. (R.R. Vol. 3 at 90) She explained that Tony made guitars and collected guns. (R.R. Vol. 3 at 91) She admitted that she went to prison in 2008 for Intoxication Manslaughter. (R.R. Vol.3 at 94) Scoggin further conceded that she and Waisner drank a few beers on the drive to Tony's property. (R.R. Vol. 3 at 93) She testified that she saw her son and Appellant standing on a 20 foot by 20 foot concrete slab which is connected to a building which acts as Tony's workshop and residence. (R.R. Vol. 3 at 96-97) Scoggin stated that she saw Appellant washing the slab with a water hose. (R.R. Vol. 3 at 98) She testified that her son asked them to leave for 45 minutes. (R.R. Vol. 3 at 103-104) Scoggin stated that when they returned that an angry, aggressive, and nude Appellant ordered them to leave. (R.R. Vol. 3 at 108-109) Scoggin noted that she has seen Appellant shooting guns on Tony's property. (R.R. Vol. 3 at 112)

### 3. Ray Rubio

Ray Rubio testified that he and Tony met 35 years ago in Junior High School and have played together in a band. (R.R. Vol. 3 at 119-120) He explained that he helped Tony construct a building on the 26-

4

acre property 13 or 14 years ago. (R.R. Vol. 3 at 124) Rubio explained that he visited Tony on the Sunday before his death to help him fill holes in his road located on the property, but Tony was unable to perform much work because of his swollen knee caused by Muscular Sclerosis. (R.R. Vol. 3 at 126) He testified that at about 12:30 p.m. on July 31, 2012, he tried to visit Tony, saw burned grass, walked into the building, and noticed a wet floor. (R.R. Vol. 3 at 128-131) He stated that Appellant told him that they were burning trash and that Tony went for a walk. (R.R. Vol. 3 at 136) Rubio testified that he did not believe her story because he knew that Tony could barely walk. (R.R. Vol. 3 at 136) He testified that Appellant said that the floor was wet from washing dog poop. (R.R. Vol. 3 at 137) Rubio acknowledged that he and Appellant were alone for about 30 minutes and she never asked for help or informed him that Sutton, Jr., had killed his father. (R.R. Vol. 3 at 138)

Rubio testified that as he was talking with Sutton, Jr., while they were sitting on buckets, a plate came flying out of the building and broke in the middle of the driveway. (R.R. Vol. 3 at 143-160) He described that Sutton, Jr., ran inside the shop where Sutton, Jr., choked Appellant. (R. R. Vol. 3 at 161) Rubio stated that after Sutton, Jr., released his grip upon his request, Appellant said "Why don't you tell him you shot your

5

dad." (R.R. Vol. 3 at 161) He testified that Sutton, Jr., ran after Appellant into the interior of the shop and emerged later with a bloody forehead. (R.R. Vol. 3 at 162) Rubio stated that he exited the property around 2:30 p.m. after Sutton, Jr., asked him to leave. (R.R. Vol. 3 at 163) Rubio testified that he had heard Sutton, Jr., and Appellant discussing the value of Tony's property a couple of weeks before the murder. (R.R. Vol. 3 at 175) He denied that he was intoxicated on July 31, 2012, although he had drunk a couple of beers at Tony's property. (R.R. Vol. 3 at 176)

### 4.    Summer Warren

Summer Warren testified that on July 31, 2012, she was working as a dispatcher for the Brazoria County Sheriff's Department. (R.R. Vol. 3 at 180-181) Warren testified that she handled a smoke complaint and a 9-1-1 call on July 31, 2012, at Tony's property. (R.R. Vol. 3 at 183-186) She explained that the 9-1-1 caller made the call at 4:00 p.m. on July 31, 2012, and stated that Sutton, Jr., had killed his father with a .40 caliber pistol and that she had shot the father with an AK-47. (R.R. Vol. 3 at 188) The caller said Sutton, Jr., shot the father when the father was unconscious. (R.R. Vol. 3 at 189)

6

On cross-examination, Warren admitted that in her previous testimony she never testified that the caller said she shot Tony with an AK-47. (R.R. Vol. 3 at 196) Warren stated she dispatched Deputy Beaver for the smoke complaint, and he arrived at 10:53 a.m. (R.R. Vol. 3 at 202) She stated that the 9-1-1 caller was hysterical and crying. (R.R. Vol. 3 at 207) Warren testified that she sent an ambulance because the caller said she was naked, had been knocked unconscious, and had suffered an epileptic attack. (R.R. Vol. 3 at 208) She testified that the caller said that her boyfriend shot his father and would not allow her to leave the property. (R.R. Vol. 3 at 212) Warren stated that the caller claimed that she had been raped and that Ray Rubio had seen Sutton, Jr., choking her. (R.R. Vol. 3 at 215-216) She testified that the caller described how Sutton, Jr., burned his father's body after shooting him with a pistol. (R.R. Vol. 3 at 215)

On redirect examination, Warren explained the discrepancy of her conflicting testimony by stating that she had the flu during the first trial and that she listened to the 9-1-1 call prior to the second trial with headphones. (R.R. Vol. 3 at 219)

### 5. David Hallimore

Sergeant David Hallimore testified that he is a forensic audio/video expert with the Houston Police Department. (R.R. Vol. 3 at 224) Hallimore testified that the 9-1-1 call was brought to him for clarification. (R.R. Vol. 3 at 227-230) He stated that he enhanced the 9-1-1 call to make the recording of the call more clear. (R.R. Vol. 3 at 224) Hallimore testified that the enhanced recording was as accurate as the original recording. (R.R. Vol. 3 at 232) The trial court admitted this enhanced recording over defense counsel's objection. (R.R. Vol. 3 at 252) Hallimore noted that the caller stated "He just killed his dad, and he's burning in the backyard." (R.R. Vol. 4 at 8) He testified that with the use of good quality headphone that he could hear the caller state "He shot him in the head and I shot him in the shoulder with an AK-47." (R.R. Vol. 4 at 12-13) Hallimore also listened to the caller claim "He's trying to put my fingerprints on the gun." (R.R. Vol. 4 at 20)

On cross-examination, Hallimore admitted that he did not know the identity of the 9-1-1 caller. (R.R. Vol. 4 at 25) He conceded that the State had asked him to review the segment about the caller's claim that she shot the deceased with an AK-47. (R.R. Vol. 4 at 31) Hallimore admitted that the caller stated that her ex-boyfriend choked her, shot his father, and burned him in a barrel. (R.R. Vol. 4 at 32-33) He testified

8

that the caller stated that her ex-boyfriend is a former Marine and will not allow her to leave the property. (R.R. Vol. 4 at 38-43) Hallimore stated that the caller mentioned that her ex-boyfriend knocked her unconscious and threw her on the floor. (R.R. Vol. 4 at 49)

### 6. David Beaver

Brazoria County Sheriff's Deputy David Beaver testified that he was dispatched to Tony's property on July 31, 2012, at 10:39 a.m. to investigate a smoke complaint. (R.R. Vol. 4 at 78-82) Beaver stated that he did not see any smoke when he arrived although he did see a burn pile. (R.R. Vol. 4 at 84) Beaver stated that Appellant told him that they were burning some old documents and even invited him to look at the burn pile. (R.R. Vol. 4 at 94) Beaver testified that he left at 10:59 a.m. after not finding anything suspicious. (R.R. Vol. 4 at 97)

Deputy Beaver testified that he received another dispatch for a disturbance at the same property at 4:06 p.m. on the same day. (R.R. Vol. 4 at 98) He explained that the priority of the call got more extreme the closer he got to the property. (R.R. Vol. 4 at 99-100) Beaver stated that he placed a naked and hysterical Appellant in his squad car after he arrived. (R.R. Vol. 4 at 101-103) He testified that he did not handcuff her, but he treated her as a victim because he saw scratches on her

9

neck and heard her state that Sutton, Jr., had killed his father. (R.R. Vol. 4 at 104-106) Beaver stated that Appellant claimed that Sutton, Jr., shot Tony in the chest after they had gotten into an argument about Sutton's Jr.'s possible rape of Appellant. (R.R. Vol. 4 at 107) He testified that Appellant told him that she placed her shirt on Tony's wound. (R.R. Vol. 4 at 108) Beaver stated that Appellant told him that Sutton, Jr., then shot his father in the head. (R.R. Vol. 4 at 109)

Deputy Beaver testified that he then saw Sutton, Jr., emerge from the building with a pink T-shirt which contained a .44 Magnum pistol. (R.R. Vol. 4 at 119) Beaver testified that Appellant pointed to a barrel on the north side of the property where Tony was burning, but he stated that the barrel was empty. (R.R. Vol. 4 at 127) He stated that he bagged Appellant's hands because of the shooting. (R.R. Vol. 4 at 129)

Deputy Beaver testified that his squad car made a recording of his conversation with Appellant. (R.R. Vol. 9 at 11-13) Beaver stated that Appellant said Tony is burning in a green barrel in the backyard. (R.R. Vol. 9 at 15-21) He testified that Appellant claimed that Sutton, Jr., shot his father with an AK-47 and then tried to kill her. (R.R. Vol. 9 at 17-22) Appellant claimed that Sutton, Jr., threw her phone when she tried to make a 9-1-1 call. (R.R. Vol. 9 at 29) He testified that Appellant

10

claimed that Sutton, Jr., killed his father because Sutton, Jr., wanted to sell the property.  (R.R. Vol. 9 at 40)  Beaver noted that he did not see any blood on Appellant even though she said that Tony's skull exploded from the gunshot.  (R.R. Vol. 9 at 45-46)  Beaver testified that Appellant rejected EMS' request to take her to a hospital and obtain a rape kit.  (R.R. Vol. 9 at 52-53)  He testified that Appellant never said that Sutton, Jr., forced her to participate in this killing or its clean up.  (R.R. Vol. 9 at 59)

On cross-examination, Beaver admitted that the shop floor appeared to be dry on his first visit to the property.  (R.R. Vol. 4 at 149)  He conceded that he only spent 5 minutes on the property during the first visit.  (R.R. Vol. 4 at 151-152)  Beaver admitted that he did not examine the burn pile even though Appellant made the offer.  (R.R. Vol. 4 at 159)  Beaver stated that the second response to the property was because of a 9-1-1 call.  (R.R. Vol. 4 at 176)  He admitted that Appellant told him that Sutton, Jr., assaulted her.  (R.R. Vol. 4 at 174)  He testified that he and Deputy Knapp looked for the barrel with Tony's remains, but they never found the body.  (R.R. Vol. 4 at 181-191)  Beaver admitted that Appellant was crying and screaming hysterically in this squad car.  (R.R. Vol. 4 at 186)

11

Beaver admitted that he just found the police car video during trial. (R.R. Vol. 9 at 60) He admitted that Appellant claimed Sutton, Jr., shot at her and choked her to the point of unconsciousness. (R.R. Vol. 9 at 87) Beaver admitted that Appellant actually reported the crime by calling 9-1-1. (R.R. Vol. 9 at 91) He conceded that the video showed that she was hysterical even when no one else was in the squad car with her. (R.R. Vol. 9 at 114) Beaver testified that Appellant stated that Sutton, Jr., killed his father a couple of hours ago and that she wished he had killed her too. (R.R. Vol. 9 at 122-126) In the video, Appellant claimed that Sutton, Jr., was mad at her for being pregnant and wanting to leave him. (R.R. Vol. 9 at 138-148) Appellant claimed that Sutton, Jr., killed his father so he could sell the property. (R.R. Vol. 9 at 158) She described how Tony was alive and screaming after Sutton, Jr., shot him in the shoulder the first time. (R.R. Vol. 9 at 159-163)

### 7. Matt West

Brazoria County Sheriff's Investigator Matt West testified that he and Deputies Smith and Beavers responded to Tony's property in response to the 9-1-1 call. (R.R. Vol. 4 at 220-223) West stated that he saw a nude and hysterical Appellant who was yelling that she had been raped. (R.R. Vol. 4 at 225) West stated that he secured the building

12

which contained so many guns that it resembled a miniature armory. (R.R. Vol. 4 at 233-234)  West testified that he bagged Sutton, Jr.'s hands.  (R.R. Vol. 4 at 238)

On cross-examination, West acknowledged that Appellant was crying.  (R.R. Vol. 4 at 240)  West explained that he terminated the search of the property when Sheriff Wagner wanted a search warrant before reentering.  (R.R. Vol. 4 at 247)

### 8.    Jack Gentry

Brazoria County Sheriff's Investigator Jack Gentry testified that he arrived at Tony's property at 5:43 p.m. on July 31, 2012, to investigate a report of a missing person.  (R.R. Vol. 5 at 18-22)  Gentry stated that he collected possible gunshot residue from the hands of both Sutton, Jr., and Appellant.  (R.R. Vol. 5 at 23-26)  Gentry stated that he found 2 shovels next to the building and 2 sets of rubber gloves in the bed of a pickup truck.  (R.R. Vol. 5 at 48-51)  He testified that he photographed a burn site which contained aerosol cans, a wooden handle, and bone fragments.  (R.R. Vol. 5 at 71)  Gentry testified that he found a red 55 gallon drum laid on its side which contained charred human remains. (R.R. Vol. 5 at 80)  He stated that he also found a 4 foot by 8 foot area of disturbed ground with a shovel, pickax, and a hoe.  (R.R. Vol. 5 at 82)

13

Gentry testified that the drum contained only part of a human body with bones sticking out from a mass of flesh.  (R.R. Vol. 5 at 84-85)

Gentry testified that he found blood and shell casings and cartridges on the shop floor.  (R.R. Vol. 5 at 99)  He stated that he swabbed the area for possible DNA testing. (R.R. Vol. 5 at 110-114) Over objection of defense counsel, Gentry testified that he collected a white stool which appeared to have a hole caused by a bullet.  (R. R. Vol. 5 at 194-204) He stated that he found a metal fragment embedded in the stool.  (R.R. Vol. 5 at 206)  Gentry described the hole as being 7-8 millimeters wide and 25 millimeters in height.  (R.R. Vol. 5 at 207)  He testified that he photographed human teeth which he found at the burn site.  (R.R. Vol. 5 at 212)  He testified that he collected hair that he found on one of the shovels. (R.R. Vol. 6 at 15)  Gentry testified that he collected cuttings from Sutton, Jr.'s and Appellant's clothing for possible DNA testing.  (R.R. Vol. 6 at 20-28)  He stated that he collected 3 weapons for testing: a MAK-90, a .44 Magnum revolver, and a Beretta 85F .380 semiautomatic handgun.  (R.R. Vol. 6 at 48)  Gentry testified that he found the hair on the blade of the shovel.  (R.R. Vol. 6 at 87)  He stated that he did not recover any prints from the 3 weapons.  (R.R. Vol. 6 at 101)

14

On cross-examination, Gentry admitted that the photographs of Sutton, Jr., showed that he was dirty and bloody and his hands had dirt under the nails and red blisters on his palms. (R.R. Vol. 7 at 18-19) Gentry admitted that he did not find any human remains in the rectangular shape area of disturbed ground. (R.R. Vol. 7 at 43) He conceded that he did not know the origin of the hole found in the foot stool. (R.R. Vol. 7 at 53) He believed that tires had been placed on top of the red barrel which contained the charred human remains in order to conceal the barrel. (R.R. Vol. 7 at 72-73) He conceded he did not find any blood on the pink T-shirt. (R.R. Vol. 7 at 74)

### 9.    Peter Marsh

Peter Marsh testified that he is a forensic dentist who can determine the identity of a person through dental records. (R.R. Vol. 6 at 53) He stated that he compared Tony's dental records to those of the teeth found at the burn site. (R.R. Vol. 6 at 60-62) Marsh concluded that the teeth found at the burn site were Tony's teeth within a reasonable medical certainty. (R.R. Vol. 6 at 62)

### 10.   Shane Windsor

Shane Windsor testified that he is a forensic scientist with the Texas Department of Public Safety who specializes in firearms and tool

mark analysis. (R.R. Vol. 6 at 67) He testified that he tested the 3 firearms collected to see if any of them fired the 2 cartridge cases found at the scene. (R.R. Vol. 6 at 71) Windsor stated that the 2 cartridge cases were .44 caliber so they could not have been fired by the MAK-90 or the Beretta. (R.R. Vol. 6 at 75) He testified that he was unable to determine if the .44 caliber bullet was fired by the .44 Magnum found at the scene because it was deformed from striking a hard surface. (R.R. Vol. 6 at 79-80) On cross-examination, Windsor admitted that the .44 caliber bullet could have been fired from the .44 Magnum revolver. (R.R. Vol. 6 at 86)

### 11. Mike Thomas

Brazoria County Sheriff's Department Officer Mike Thomas testified that he took a buccal swab from the mouths of Sutton, Jr., and Appellant for DNA testing purposes. (R.R. Vol. 7 at 80-86) Thomas testified that he performed a forensic examination of the cell phone seized by Investigator Roberts. (R.R. Vol. 9 at 200) He noted that the phone was not broken or damaged. (R.R. Vol. 9 at 202) Thomas testified that he retrieved the metadata from the phone so that he could find the time and date of any photographs taken. (R.R. Vol. 9 at 206) He noted that several of the photographs were taken on June, 14, 2012,

16

and showed Tony's property including a green barrel. (R.R. Vol. 10 at 10-14) Thomas stated that some of the pictures showed Appellant shooting an assault rifle, including an AK-47 taken on June 3, 2012. (R.R. Vol. 10 at 16-23) He testified that he downloaded a video taken on June 3, 2012, which showed Appellant. (R.R. Vol. 10 at 37)

Thomas testified that he assisted Deputy Gentry in investigating this murder by testing the property for the presence of blood. (R.R. Vol. 10 at 57-58) Thomas testified that the phone also contained several photographs of Sutton, Jr., firing guns. (R.R. Vol. 10 at 76-78)

On cross-examination, Thomas admitted that he did not know to whom the cell phone was registered. (R.R. Vol. 10 at 82) He also conceded that he did not know who took the photographs or the videos. (R.R. Vol. 10 at 83) Thomas admitted that the cell phone was in a protective case which could have kept the phone from being damaged. (R.R. Vol. 10 at 112)

On redirect examination, Thomas testified that the cell phone was an iPhone 4s from which he downloaded about 1220 pictures and which 75 percent were "selfies" of Appellant. (R.R. Vol. 10 at 116-118)

### 12. Amy Smuts

17

Amy Smuts testified that she is a forensic analyst for the University of North Texas Science Center for Human Identification.  (R.R. Vol. 7 at 94)  Smuts stated that she reviewed 10 items sent to her by the Brazoria County Sheriff's Department.  (R.R. Vol. 7 at 103) Smuts stated that the DNA of the hair found on the shovel matched Tony's DNA.  (R.R. Vol. 7 at 125)  She testified that the DNA of the blue jean cutting showed a DNA profile of at least 3 individuals in which Tony and his son were contributors.  (R.R. Vol. 7 at 136)  Smuts testified that she also performed a paternity test which revealed that there was a 99.91 percent chance that Tony was the father of Sutton, Jr.  (R.R. Vol. 7 at 138)

### 13.   Jennifer Moreno

Jennifer Moreno testified that she is a forensic DNA analyst for the Texas Department of Public Safety Crime Laboratory in Houston, Texas, who analyzes degraded DNA samples.  (R.R. Vol. 7 at 149-151) Moreno explained that heat, sunlight, and water can degrade DNA to make DNA identification more difficult. (R.R. Vol. 7 at 154)  She testified that she found the DNA of Sutton, Jr., and Appellant on the MAK-90 weapon.  (R.R. Vol. 7 at 162-163)  On cross-examination, she admitted

18

that her testing does not determine when the person's DNA was left on the item. (R.R. Vol. 7 at 167)

### 14. Juan Rojas

Juan Rojas testified that he is a traced evidence examiner for the Texas Department of Public Safety who analyzes gunshot residue. (R.R. Vol. 7 at 171) Rojas explained that a shooter will receive gunshot residue from the gases expelled from the back of a gun that has been fired. (R.R. Vol. 7 at 174) He further explained that gunshot residue consists of three substances: antimony, barium, and lead. (R.R. Vol. 7 at 180) Rojas testified a characteristic particle contains all 3 substances while an indicative particle only contains 2 of the substances. (R.R. Vol. 7 at 180) He testified that Sutton, Jr.'s hand had 1 characteristic and 5 indicative particles. (R.R. Vol. 7 at 179) Rojas testified that Appellant's hands only contained 1 indicative particle. (R.R. Vol. 7 at 184) He explained that he must find 6 particles before he can conclude that a person fired a gun. (R.R. Vol. 7 at 182) Rojas concluded that he did not know whether or not Appellant fired a gun. (R.R. Vol. 7 at 198)

On cross-examination, Rojas admitted Sutton, Jr., fired a gun, but he did not know if Appellant did. (R.R. Vol. 7 at 199) Rojas admitted

that he normally only collected gunshot residue within 4 hours of the gunshot. (R.R. Vol. 7 at 215) He explained that Appellant's gunshot residue was found on her left hand, while Sutton, Jr.'s gunshot residue was found on his right hand. (R.R. Vol. 7 at 218-221)

### 15. Chris Kincheloe

Brazoria County Sheriff's Department Captain Chris Kincheloe testified that he arrived at Tony's property at around 4:15 p.m. on July 31, 2012. (R.R. Vol. 8 at 7-14) Kincheloe described Sutton, Jr., to have a giddy excitement when he spoke to him in the squad car. (R.R. Vol. 8 at 17) He testified that he spoke with Appellant while she was being treated in an ambulance for bruises and scratches to her neck. (R.R. Vol. 8 at 19-20) Kincheloe stated that he read Appellant her Miranda warnings before speaking to her. (R.R. Vol. 8 at 22)

Kincheloe testified that Appellant informed him that Sutton, Jr., shot and killed Tony after Tony became upset over Sutton, Jr. and Appellant loudly arguing in the middle of the night. (R.R. Vol. 8 at 44-45) She stated that Sutton, Jr., assaulted her. (R.R. Vol. 8 at 45) Kincheloe testified that Appellant told him Sutton, Jr., shot his father once in the back and then shot him in the head before burning his father's body. (R.R. Vol. 8 at 46-49) He stated that Appellant led him to a burn site

20

where she believed Sutton, Jr. had burned Tony's body, but he did not find the body. (R.R. Vol. 8 at 52-54)

Kincheloe testified that Appellant agreed to accompany him to the police station without handcuffs in order for him to take her statement. (R.R. Vol. 8 at 56) He stated that the argument between Sutton, Jr., and his father escalated to the point that Sutton, Jr., shot his father in the chest with a .44 Magnum revolver. (R.R. Vol. 8 at 60) Kincheloe testified that Appellant claimed that as she rushed to Tony's side to help him by placing her shirt on his wound that Sutton, Jr., then shot his father in the head with the .44 Magnum revolver. (R.R. Vol. 8 at 61) He noted that he did not see any blood or brain matter on Appellant even though a .44 Magnum revolver is a powerful handgun. (R.R. Vol. 8 at 63) He stated that Appellant told him that Sutton, Jr., shot his father in the morning. (R.R. Vol. 8 at 75) Kincheloe testified that he typed as she spoke, and she signed the statement. (R.R. Vol. 8 at 80)

Kincheloe testified that Appellant had scratches on her neck and stomach. (R.R. Vol. 8 at 87-90) He stated that her statement described that their fight began when she informed him she was breaking up with him. (R.R. Vol. 8 at 99-100) Kincheloe testified that Appellant claimed in her statement that Sutton, Jr., shot his father after the deputy

21

responded to the smoke complaint. (R.R. Vol. 8 at 103-106) She described how Sutton, Jr., took her phone and then put a gun to his father's head and shot him while she held her shirt on his wound. (R.R. Vol. 8 at 111-112) Appellant claimed that she asked Rubio to take her away because Sutton, Jr., had killed his father. (R.R. Vol. 8 at 116) Kincheloe testified that Appellant stated that Sutton, Jr., then choked her to the point of unconsciousness. (R.R. Vol. 8 at 117) Appellant claimed in her statement that she ran naked outside and called 9-1-1 after she awakened. (R.R. Vol. 8 at 120) Kincheloe testified that Appellant was not crying or hysterical when she gave her statement. (R.R. Vol. 8 at 126) He stated that he did not arrest Appellant that evening and even instructed Deputy Snelgrove to escort her to a friend's home in Freeport. (R.R. Vol. 8 at 129-131) Kincheloe testified that she rejected his request to provide her medical treatment for her rape. (R.R. Vol. 8 at 132) He admitted that Appellant never told her that Sutton, Jr., forced her to participate in this killing and subsequent cleaning. (R.R. Vol. 8 at 139) Kincheloe concluded that there was more to Appellant's story than she told him. (R.R. Vol. 8 at 135)

### 16. Stephen Pustilnik

Galveston County Chief Medical Examiner Dr. Stephen Pustilnik testified that he performed the autopsy on the deceased. (R.R. Vol. 8 at 141) Pustilnik testified that Tony's charred remains were located in a barrel and weighed 52 pounds. (R.R. Vol. 8 at 146) He stated that the hemorrhaging that he found in the brain meant that Tony was alive when he was shot in the head. (R.R. Vol. 8 at 152) He testified that he could not see a gunshot wound in a burned body unless it goes through a bone. (R.R. Vol. 8 at 156). Pustilnik concluded that the cause of death was possible multiple gunshot wounds. (R.R. Vol. 8 at 157) He explained that he believed that there was a second gunshot wound because of a metal fragment on Tony's clavicle bone that he saw on the X-Ray. (R.R. Vol. 8 at 164) Pustilnik testified that the metal fragment was consistent with a gunshot wound. (R.R. Vol. 8 at 166)

Pustilnik testified that it would have taken at least 30 minutes and up to 2 hours at a temperature of 1500 to 2000 degree to burn Tony's body to this extent. (R.R. Vol. 8 at 173-174) Pustilnik also noted that the hole in the foot stool is more consistent with a 7.69 by .39 millimeter bullet than from a .44 Magnum bullet. (R.R. Vol. 8 at 197)

On cross-examination, Pustilnik admitted that he performed the autopsy on August 1, 2012, but reexamined Tony's X-rays on May 29,

23

2013, at the request of the Brazoria County District Attorney's Office. (R.R. Vol. 8 at 203-207) He conceded that he amended his autopsy report to include the metal fragment on the collarbone although the fragment was less than a millimeter in size. (R.R. Vol. 8 at 208) Pustilnik testified that while he was 99.98 percent certain of one gunshot wound, but he was only 25 to 30 percent certain of second gunshot wound. (R.R. Vol. 8 at 217) He stated that Tony could have lived for 15 minutes to an hour from the shot to the shoulder area depending on whether or not the bullet tore through the lungs or a major artery near the clavicle. (R.R. Vol. 8 at 218) He stated that Tony was definitely alive and probably capable of speaking when the second shot was fired. (R.R. Vol. 8 at 226)

### 17. Steve Roberts

Brazoria County Sheriff's Department Investigator Steve Roberts testified that he seized a cell phone based on a search warrant and gave it to Lieutenant Parmiter. (R.R. Vol. 9 at 188-191)

### 18. Varon Snelgrove

Brazoria County Sheriff's Lieutenant Varon Snelgrove testified that he was present when Kincheloe spoke with Appellant at the crime scene and at the police station. (R.R. Vol. 10 at 120-128) Snelgrove stated

24

that Appellant was naked and not handcuffed when she told them that Sutton, Jr., killed his father and made her watch. (R.R. Vol. 10 at 130) Snelgrove stated that Appellant was not under arrest when he and Kincheloe took her to the police station for her statement. (R.R. Vol. 10 at 134) He testified that after the interview he was going to take her to the Women's Shelter in Angleton, but Appellant insisted on returning to Tony's property to retrieve her phone. (R.R. Vol. 10 at 136) Snelgrove stated that on the ride to the property, Appellant stated that she thought she would sell the property for $500,000.00. (R.R. Vol. 10 at 139-140) He testified that she also requested a .50 caliber rifle and a Beretta handgun from Tony's place. (R.R. Vol. 10 at 141) Snelgrove stated that Appellant said that she was the half owner of the property. (R.R. Vol. 10 at 143) He testified that after retrieving the cell phone and making some calls, Appellant requested that he take her to a friend's home in Freeport. (R.R. Vol. 10 at 144) Snelgrove described how Appellant became hysterical when she spoke with her mother on the cell phone, but then became calm once the call ended. (R.R. Vol. 10 at 145-146)

On cross-examination, Snelgrove conceded that he was not aware that Appellant was 2 months pregnant at the time. (R.R. Vol. 10 at 159) Snelgrove admitted that being a witness to a murder would be a

25

traumatic experience.  (R.R. Vol. 10 at 162)  Snelgrove stated that he believed that Appellant was faking being emotional in Deputy Beaver's car video because he never saw Appellant shed a tear.  (R.R. Vol. 10 at 174)  He admitted that Sutton, Jr., had been recently arrested on July 4, 2012, for assaulting a peace officer.  (R.R. Vol. 10 at 178)  Snelgrove admitted that he heard Appellant tell her mother that Sutton, Jr., shot his father and made her watch.  (R.R. Vol. 10 at 179)  Snelgrove agreed that victims of domestic violence often do not pursue charges, but noted that they often invent abuse charges too.  (R.R. Vol. 10 at 189)

### 19.   Crockett Robinson

Crockett Robinson testified that he lives in Freeport, Texas, and has known Sutton, Jr., since they were 5 or 6 years old.  (R.R. Vol. 10 at 191-192)  Robinson stated that Sutton, Jr., left the Marine Corps in April of 2012 and met Appellant at the beginning of July of 2012.  (R.R. Vol. 10 at 194)  He testified that on July 31, 2012, Appellant called and asked him if she could come to his house because Sutton, Jr., had killed his father.  (R.R. Vol. 10 at 195)  Robinson described Appellant as crying hysterically as she told him, his mother, and his mother's boyfriend how Sutton, Jr., shot and killed his father after an argument over a bathroom light being left on.  (R.R. Vol. 10 at 197)  He testified that Appellant said

that Sutton, Jr., shot his father in the back from an upstairs balcony then came downstairs and shot him in the head with a pistol as he said "Fuck you dad." (R.R. Vol. 10 at 198) Robinson stated that Appellant informed them that Sutton, Jr., forced her to watch him kill his father. (R.R. Vol. 10 at 199) Robinson testified that Appellant claimed that Sutton, Jr., choked her then burned his father's body. (R.R. Vol. 10 at 200) She claimed that Sutton, Jr., then choked her so hard that she became unconscious. (R.R. Vol. 10 at 201) He testified that Appellant claimed that after she awakened she ran outside nude and called the police as the dogs ran outside with her. (R.R. Vol. 10 at 201) He found it hard to believe that Sutton, Jr., would kill his father over a light switch. (R.R. Vol. 10 at 204)

On cross-examination, Robinson admitted that Sutton, Jr., served in the Marine Corps for about 5 years. (R.R. Vol. 10 at 208) He described the relationship between Sutton, Jr., and Tony as cordial. (R.R. Vol. 10 at 212) Robinson stated that Tony was a gun collector. (R.R. Vol. 10 at 213) He admitted that Appellant told him that Tony was still alive after the first gunshot. (R.R. Vol. 10 at 218) Robinson also admitted that Appellant claimed that she tried to call for help but Sutton, Jr., stopped her. (R.R. Vol. 10 at 219)

## 20. Stephanie Robinson

Stephanie Robinson testified that she has lived in Freeport, Texas, for 48 years. (R.R. Vol. 10 at 226) She testified that Sutton, Jr., had previously introduced Appellant as his girlfriend. (R.R. Vol. 10 at 229) Stephanie said Appellant was crying as she told them that Sutton, Jr., had killed his father. (R.R. Vol. 10 at 232) She testified that Appellant said that Sutton, Jr., shot his father in the shoulder with an AK-47 and then she put her shirt on Tony to stop the bleeding. (R.R. Vol. 11 at 9-12) Stephanie stated that Appellant claimed that Tony's head exploded in her lap, but Stephanie stated she did not see any blood on Appellant. (R.R. Vol. 11 at 14-16) She claimed that Appellant told her that Sutton, Jr., forced Appellant to wrap Tony's head in wrapping paper and then forced Appellant to watch him burn Tony's body. (R.R. Vol. 11 at 18) Stephanie testified that Appellant claimed that Sutton, Jr., killed his father at 1:00 p.m. in the afternoon. (R.R. Vol. 11 at 22) Stephanie testified that Appellant claimed that the police said that her child would inherit Tony's property. (R.R. Vol. 11 at 24) Stephanie testified that Appellant asked her and her boyfriend to drive her to Scoggin's home in Surfside, Texas. (R.R. Vol. 11 at 28-29)

On cross-examination, Stephanie admitted that Appellant told her that Sutton, Jr., shot his father first with an AK-47 and then with a pistol. (R.R. Vol. 11 at 52) Stephanie conceded that Appellant told her that Sutton, Jr., choked her several times and that Appellant tried to save Tony. (R.R. Vol. 11 at 54-58) She admitted that she did not believe Appellant and wanted her out of the house so she agreed to take her to Scoggin's house. (R.R. Vol. 11 at 68) Stephanie testified that Appellant never mentioned that Sutton, Jr., had raped her. (R.R. Vol. 11 at 70) She admitted that Sutton, Jr., had anger management issues before entering the Marine Corps. (R.R. Vol. 11 at 77) The State rested. (R.R. Vol. 6 at 43)

**B.    Defense's Witnesses**

**1.    Brent Waisner**

Waisner admitted that he has been convicted of felony Theft. (R.R. Vol. 11 at 120) He conceded that Sutton, Jr., was discharged in early 2012 from the Marine Corps for drug abuse. (R.R. Vol. 11 at 122) Waisner admitted to drinking 3 beers before driving to Tony's property, but he denied that he was intoxicated. (R.R. Vol. 11 at 128) Waisner stated that he saw Appellant begin washing blood from the concrete slab

29

after Sutton, Jr., whispered into her ear.  (R.R. Vol. 11 at 132)  He explained that he stayed in the car and Appellant stood on the concrete slab for about 20 minutes while Scoggin walked inside the building to find Sutton, Jr.  (R.R. Vol. 11 at 138)  He stated that Sutton, Jr., yelled at him to get off of the property, but admitted that he never mentioned in his previous testimony that Appellant had screamed at them to leave.  (R.R. Vol. 11 at 148)  Waisner admitted that even after learning of Tony's death that he and Scoggin did not make a statement to the police because they did not want to get Sutton, Jr., in trouble.  (R.R. Vol. 11 at 152-153)

On redirect examination, Waisner testified that he did not see Sutton, Jr., force Appellant to do anything.  (R.R. Vol. 11 at 163)  He admitted he did not want to get involved because of his past criminal history and because he had been drinking.  (R.R. Vol. 11 at 165)  Waisner agreed that Appellant never asked him for help.  (R.R. Vol. 11 at 166)

### 2.    Samantha Scoggin

Samantha Scoggin testified that she met Appellant about a couple of months before Tony's death and that Tony seemed to like

Appellant. (R.R. Vol. 11 at 179) Scoggin stated that she saw smoke both times she entered Tony's property on July 31, 2012. (R.R. Vol. 11 at 181-185) She claimed that she made a smoke complaint to the police after she left the property the second time. (R.R. Vol. 11 at 191)

### 3. Ray Rubio

Rubio stated that he saw smoke coming from a red barrel which was laid on its side and located on the northeast side of the building. (R.R. Vol. 11 at 208-209) Both Sutton, Jr., and Appellant told him that Tony had gone for a walk. (R.R. Vol. 11 at 215-218) He stated that after Sutton, Jr., tried to choke Appellant that Appellant said that Sutton, Jr., had shot and killed his father. (R.R. Vol. 11 at 223) Rubio testified he left the property at about 2:30 p.m. after Sutton, Jr., told him to leave. (R.R. Vol. 11 at 227-230)

### 4. Jerome Griffin

Brazoria County Sheriff's Department Investigator Jerome Griffin testified that he interviewed Ray Rubio who provided him a voluntary statement. (R.R. Vol. 11 at 242-243)

### 5. Jack Gentry

31

Brazoria County Sheriff's Department Investigator Jack Gentry testified that the photographs of 2 blood test kits were for the testing of blood and were not pregnancy test kits. (R.R. Vol. 11 at 256)

**6.      Chris Kincheloe**

Captain Chris Kincheloe testified that Waisner eventually stopped cooperating with the murder investigation. (R.R. Vol. 12 at 8) He stated that he arrested Appellant at Scoggin's house on August 1, 2012, for an open arrest warrant from Montgomery County, Texas, for the misdemeanor charge of Possession of Marijuana. (R.R. Vol. 12 at 9) He admitted that Deputy West's car video showed Sutton, Jr., laughing and smiling on July 31, 2012. (R.R. Vol. 12 at 14-16) Kincheloe admitted to making some mistakes on the statement he typed for Appellant to sign. (R.R. Vol. 12 at 35) He believed that the evidence found was not consistent with Appellant's statement. (R.R. Vol. 12 at 39)

**7.      Karen Humaran**

Karen Stinnett Humaran testified that Appellant was one of her three daughters. (R.R. Vol. 12 at 44) She stated that when Appellant was 19 years old she moved out of their Kingwood home and moved in

with Sutton, Jr. (R.R. Vol. 12 at 9) Karen Humaran testified that Appellant called her crying and hysterical both in the afternoon and in the evening of July 31, 2012. (R.R. Vol. 12 at 50) She stated that Appellant later gave birth to a son named James Gabriel. (R.R. Vol. 12 at 51)

The Defense rested. (R.R. Vol. 12 at 65)

The trial court denied Appellant's motion to remove a juror whom the Appellant claimed had been sleeping during trial. (R.R. Vol. 12 at 75)

The trial court denied Appellant's request for an instruction in the jury charge for necessity and duress. (R.R. Vol. 12 at 88)

## C. Jury's Verdict

The jury found Appellant guilty of Murder. (R.R. Vol. 13 at 135)

### PUNISHMENT PHASE

## A. State's Witness

### 1. Chris Kincheloe

33

Captain Chris Kincheloe testified that a search of Tony's property revealed 3 or 4 flat screen televisions, a Dale Earnhardt commemorative jacket, many bottles of liquor, numerous DVDs, and a box with a derringer pistol engraved with the name of Ben Devine. (R.R. Vol. 14 at 26-34) Kincheloe stated that Appellant informed him that Sutton, Jr., had burglarized some homes in Surfside while she acted as a lookout. (R.R. Vol. 14 at 28 & 36) He testified that the house she showed him belonged to Benjamin Devine and looked as if it had been ransacked. (R.R. Vol. 14 at 40) Kincheloe stated that a woman's driver's license and jewelry found on Sutton, Jr., belonged to Wassberg who lived down the street from Devine. (R.R. Vol. 14 at 42) On cross-examination, Kincheloe admitted that Appellant helped him in the burglary investigation. (R.R. Vol. 14 at 43-45)

### 2.   Steve Roberts

Investigator Steve Roberts testified that the derringer, Dale Earnhardt jacket, bottles of liquor, and televisions had been burglarized from Devine's Surfside home. (R.R. Vol. 14 at 48-56) Roberts stated that some electronic and the bottles of liquor had been burglarized from Wassberg's home. (R.R. Vol. 14 at 58-63) On cross-examination,

Roberts testified that Appellant was charged with Burglary and Tampering with Evidence, but admitted that she was helpful in the burglary investigation. (R.R. Vol. 14 at 65)

### 3. Ben Devine

Ben Devine testified that he lives in Cypress, Texas, and owns a beach house in Surfside. (R.R. Vol. 14 at 69) Devine stated that his beach house had been ransacked and the windows had been broken. (R.R. Vol. 14 at 72) He testified that the Dale Earnhardt jacket, stereos, televisions, DVDs, and more than 80 bottles of liquor had been stolen. (R.R. Vol. 14 at 73-75)

### 4. Heather Bailey

Heather Bailey testified that Appellant and Sutton, Jr., used cocaine almost every day. (R.R. Vol. 14 at 84) Bailey stated that she suggested that Appellant have sex with her dentist friend named Michael McCann after Appellant told her that Appellant needed to make some money without Sutton, Jr.'s knowledge. (R.R. Vol. 14 at 85-86) She stated that she took Appellant to McCann's home for sex, but McCann later emerged naked from his bedroom and complained that his money clip was missing. (R.R. Vol. 14 at 89) Bailey testified that Appellant returned the money clip with the money to McCann. (R.R. Vol. 14 at 89)

She stated that she visited Appellant at Tony's residence and saw at least 10 televisions and 50 to 60 bottles of liquor. (R.R. Vol. 14 at 92) Bailey described Appellant's cell phone conversation while they waited outside of McCann's house in which Appellant demanded to trade pistols for drugs or she threatened to shoot the caller's house. (R.R. Vol. 14 at 96)

On cross-examination, Bailey admitted that she only heard Appellant and Sutton, Jr., discuss using cocaine, she never saw them use cocaine. (R.R. Vol. 14 at 99) Bailey explained that McCann gave her the prostitution fee, and she split the fee with Appellant. (R.R. Vol. 14 at 108)

### 5.    Michael McCann

Michael McCann testified that he was a dentist in Brazoria, Texas, who used Bailey to obtain girls for sex. (R.R. Vol. 14 at 111) McCann stated that Appellant stole his money clip when Bailey brought Appellant to his home for sex. (R.R. Vol. 14 at 113-114) He believed that she probably stole his Beretta pistol too, but he did not realize it was missing until several months later. (R.R. Vol. 14 at 115)

On cross-examination, McCann stated that he was a 64 year old single man with two children. (R.R. Vol. 14 at 117) He testified that this

is the only time he used Bailey to bring him a girl, and he denied that he paid Bailey any money. (R.R. Vol. 14 at 119)  He testified that Bailey used to live with him, but he only had sex with her once.  (R.R. Vol. 14 at 120-122)

**6.    Christina Coronado**

Christina Coronado testified that she is an Investigator with the Domestic Violence Unit of the Harris County Precinct 4 Constable's Office. (R.R. Vol. 14 at 128)  Coronado stated that she interviewed Appellant who claimed that a man choked her on January 27, 2012. (R.R. Vol. 14 at 131-133)  She testified that she interviewed Appellant again on February 1, 2012, and Appellant claimed that she had made a false report about the choking and the red marks came from rough sex. (R.R. Vol. 14 at 140-141)

On cross-examination, Coronado admitted that the assault case for which Appellant was a victim was dismissed because Appellant had been indicted for Murder and not because of her recantation.  (R.R. Vol. 14 at 155)  Coronado admitted that Appellant did not want her abuser to go to jail. (R.R. Vol. 14 at 174)  Coronado testified that Appellant became emotional in the second interview when she realized that she could be charged with a crime.  (R.R. Vol. 14 at 176)

The State rested.  (R.R. Vol. 14 at 195)

The trial court sustained State's objection to Appellant's request to introduce evidence of Sutton's Jr.'s suicide at his prison cell.  (R.R. Vol. 15 at 23-24)

## B.    Defense's Witness

### 1.    Cheri Schultz

Cheri Schultz testified that she is a Mitigation Specialist who used to work for the Harris County Probation Department.  (R.R. Vol. 15 at 29)  Schultz stated that she interviewed Appellant, her parents, her sisters, and even met her son James Gabriel.  (R.R. Vol. 15 at 31-36)  She explained that Appellant was bullied when she was young so she had self-esteem problems and chose to date the wrong men.  (R.R. Vol. 15 at 37-39)  Schultz recommended a minimum prison sentence of less than 20 years so that Appellant could return home and raise her son.  (R.R. Vol. 15 at 44-45)

On cross-examination, she conceded that she did not interview any of the State's witnesses to this murder. (R.R. Vol. 15 at 48)  Schultz admitted that Appellant was raised by a good family which afforded her many chances in life.  (R.R. Vol. 15 at 51)  She stated that she focused on the client and not on the crime.  (R.R. Vol. 15 at 59)

The trial court denied Appellant's Motion For Mistrial based on the prosecution's comment on Appellant failure to testify. (R.R. Vol. 15 at 68-69)

The Defense rested. (R.R. Vol. 15 at 70)

The trial court denied Appellant's request for the issue of Sudden Passion. (R.R. Vol. 15 at 72)

## C.     Jury's Sentence

The jury assessed a sentence of 50 years in the Texas Department of Criminal Justice. (R.R. Vol. 15 at 109)

# POINTS OF ERROR

**POINT OF ERROR ONE:**

The evidence was insufficient to support Appellant's conviction for Murder.

**POINT OF ERROR TWO:**

The evidence is insufficient to prove that Appellant acted as a party to Murder.

**POINT OF ERROR THREE:**

The trial court erred by denying Appellant's Motion to Suppress DNA evidence derived from Appellant's cell phone.

**POINT OF ERROR FOUR:**

The trial court erred by denying Appellant's Motion For a Mistrial concerning the prosecutor's comment on Appellant's failure to testify.

**POINT OF ERROR FIVE:**

The trial court erred by denying Appellant's Motion for Continuance.

**POINT OF ERROR SIX:**

The trial court erred by denying Appellant's Requested changes to the jury charge in the Guilt-Innocence Phase of the Trial.

**POINT OF ERROR SEVEN:**

The trial court erred by excluding evidence of Clinton Anthony Sutton, Jr.'s suicide.


**POINT OF ERROR EIGHT:**

The trial court erred by admitting expert testimony of Hallimore about contents of the enhanced 9-1-1 call.

**POINT OF ERROR NO. 1**

**THE EVIDENCE WAS INSUFFICIENT TO SUPPORT APPELLANT'S CONVICTION FOR MURDER**

Appellant contends that the State has not proven its case beyond a reasonable doubt because the State has failed to show beyond a reasonable doubt that Humaran killed Clinton Anthony Sutton, Sr.

The test for reviewing the insufficiency of the evidence where a defendant has been found guilty is for the reviewing court to determine whether, after viewing the relevant evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. **Brooks v. State**, 323 S.W.3d 893 (Tex. Crim. App. 2010)  Thus, the issue on appeal is not whether the appellate court believes the State's evidence or instead believes the appellant's evidence outweighs the State's evidence. **Wicker v. State**, 667 S.W. 2d 137, 143 (Tex. Crim. App. 1984) The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt.  **Matson v. State**, 819 S.W. 2d 839, 846

42

(Tex. Crim. App. 1991)  The jury, as the sole judge of the facts, is entitled to resolve any conflicts in the evidence, to evaluate the credibility of witnesses, and to determine the weight to be given any particular evidence.  **Jones v. State**, 944 S.W. 2d 642, 647 (Tex. Crim. App. 1996) Section 19.02 (a) of the **Texas Penal Code** provides that a person commits the offense of Murder if he intentionally or knowingly causes the death of an individual.  (West 2014)

The only evidence which shows that Appellant caused the death of Clinton Sutton, Sr., was the barely audible statement of Appellant on her 9-1-1 call that she shot Tony with an AK-47 and Sutton, Jr., shot him with a .44 caliber pistol.

Appellant contends that the evidence that she did not cause Tony's death overwhelmingly outweighs the evidence which shows that she did and is listed as follows:

1)    Appellant's statements on Beaver's videotape.

2)    No evidence that Appellant fired a weapon.

**3)**    Kincheloe's testimony.

4)    Snelgrove's testimony.

5)    Crockett Robinson's testimony.

43

6)    Stephanie Robinson's testimony.

7)    Appellant is only guilty of Aggravated Assault

**1.    Appellant's statement to Deputy Beaver that Sutton, Jr., killed his father.**

Deputy Beaver testified that Appellant told him that Sutton, Jr., shot his father once in the chest and a second time in the head. (R.R. Vol. 4 at 107-109)  Beaver admitted that Appellant claimed that Sutton, Jr., shot Tony with an AK-47 and then tried to kill her.  (R.R. Vol. 9 at 17-22)

**2.    No evidence that Appellant fired a weapon.**

Rojas testified that he could find only one of the necessary 6 required gunshot residue particles on Appellant in order for him to determine if she fired a weapon. (R.R. Vol. 7 at 182-184)  Therefore, he concluded that he did not know if Appellant fired a gun on July 31, 2012. (R.R. Vol. 7 at 198)

**3.    Kincheloe's testimony that Appellant claimed Sutton, Jr., killed Tony.**

Kincheloe testified that Appellant informed him that Sutton, Jr., shot and killed Tony after Tony became upset over Sutton, Jr., and Appellant loudly arguing in the middle of the night.  (R.R. Vol. 8 at 44-45)

**4.  Snelgrove's testimony that Appellant claimed that Sutton, Jr., killed Tony.**

Snelgrove testified that Appellant told him that Sutton, Jr., killed his father and made her watch.  (R.R. Vol. 10 at 130)

**5.  Crockett Robinson's testimony.**

Crockett Robinson testified that Sutton, Jr., killed his father after an argument over a bathroom light being left on.  (R.R. Vol. 10 at 197)

**6.  Stephanie Robinson's testimony.**

Stephanie Robinson testified that Sutton, Jr., shot his father in the shoulder with an AK-47 and then shot him again in the head.  (R.R. Vol. 11 at 14)

**7.  Aggravated Assault.**

Pustilnik testified that Tony could have lived for an hour after the first shot to his shoulder.  (R.R. Vol. 8 at 219)  He admitted that Tony was alive and capable of speaking when he was shot in the head.  (R.R. Vol. 8 at 226)

Appellant's statements to multiple officers and the Robinson family describe Appellant as an unwilling bystander to a son's murder of his father. The physical evidence of the gunshot residue supports Appellant's claims that she did not shoot Tony. Warren and Hallimore's testimony that a virtually inaudible portion of Appellant's 9-1-1 call was an admission by Appellant that she initially shot Tony with an AK-47 before Sutton, Jr., shot Tony again with a pistol lacks credibility when compared with her statements to multiple officers that are consistent in their conclusion that Sutton, Jr., killed his father with shots his to shoulder and head. Therefore, Appellant contends that the State provided insufficient proof that Appellant killed Tony based on the inaudible segment of a 9-1-1 call.

Even if the jury believed that Appellant shot Tony first in the shoulder with an AK-47, Pustilnik's testimony showed that Tony was alive and capable of speaking before his son killed him with a shot to the head. Pustilnik admitted that Tony could have survived the first shot if he had received medical treatment; however, the second shot ended that possibility. Therefore, the evidence showed that Appellant is only guilt of the second degree felony of Aggravated Assault and not Murder.

Even when viewing the evidence in the light most favorable to the jury's verdict, a rational trier of fact would not have found the essential elements of Murder beyond a reasonable doubt.  Therefore, the evidence is legally insufficient to sustain Appellant's conviction for Murder.

## POINT OF ERROR NO. 2

## THE EVIDENCE IS INSUFFICIENT TO PROVE THAT APPELLANT ACTED AS A PARTY TO MURDER

The Appellant contends that the evidence is insufficient to prove that she acted as a party to the murder of Clinton Sutton, Sr.

"A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense; he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." **Texas Pen. Code** §7.02(a)(2) (West 2014)  In reviewing the evidence regarding a defendant's culpability under the law of parties, the courts may look to events occurring before, during, and after the commission of the offense, and may rely upon actions of the defendant which show an understanding and common design to do the prohibited act. **Ransom v. State**, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994)  "Mere presence at the scene of the offense does not establish guilt as a party to the offense." **Porter v. State**, 634 S.W.2d 846, 849 (Tex. Crim. App. 1982)

While Appellant testified that she was present at Tony's property, she denied participating in Tony's shooting and claimed that Sutton, Jr., shot his father twice and killed him. (R.R. Vol. 4 at 101-109) Captain Kincheloe, Lieutenant Snelgrove, Deputy Beaver, Deputy West, Deputy Thomas, Crockett Robinson, and Stephanie Robinson all testified that Appellant appeared scared and emotional when she informed them that Sutton, Jr., shot and killed his father. In fact, Kincheloe testified that Appellant voluntarily met with him and described how Sutton, Jr., choked her repeatedly to the point of unconsciousness, raped her, took her phone from her, and described how she finally had to call 9-1-1 to report Sutton, Jr.,'s crime. (R.R. Vol. 8 at 87-129) Kincheloe even noted that Appellant had asked Rubio to take her away because Sutton, Jr., had killed his father. (R.R. Vol. 8 at 118) In addition, to Appellant's statements that Sutton, Jr., killed his father, Rojas' testimony supports Appellant's contention because the gunshot residue was found on Sutton, Jr. and not on Appellant. (R.R. Vol. 7 at 198)

The testimony of the State's witnesses showed that Appellant did not solicit, encourage, direct, aid, or attempt to aid Sutton, Jr., commit Tony's murder. In fact, the testimony supports Appellant's contention that Sutton, Jr., was a disgraced ex-Marine with anger problems who

49

killed his father, forced Appellant to cover up the evidence of the killing, and then choked and raped her when she refused to participate any further. Moreover, the fact that Appellant called 9-1-1 to alert the authorities to crime further supports Appellant's claim that she was not a party to the murder. If she had acted in concert with Sutton, Jr., she would have helped him thoroughly conceal all of the evidence of the crime instead of inviting the authorities to a recent crime scene. Therefore, the State has failed to prove that Appellant was a party to the murder of Clinton Sutton, Sr.

# POINT OF ERROR NO. 3

## THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO SUPPRESS DNA EVIDENCE AND EVIDENCE DERIVED FROM DEFENDANT'S CELL PHONE

Appellant Humaran filed written pretrial Motions to Suppress in which she argued that the warrant authorizing the seizure of her DNA evidence and evidence seized from her cell phone should have been suppressed. (TR. Vol. 1 at 1232-1238)  The trial court denied Appellant's Motions To Suppress the cocaine and the money.  (R.R. Supp. at 27)

The appellate court reviews a trial court's ruling on a motion to suppress evidence for an abuse of discretion.  **Balentine v. State**, 71 S.W.3d 763 (Tex. Crim. App. 2002)   At a suppression hearing, the trial court is the sole and exclusive trier of fact and judge of credibility of the witnesses, as well as the weight to be given their testimony.  **Romero v. State**, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)  In reviewing a trial court's ruling on the motion to suppress, the appellate court gives almost total deference to a trial court's determination of historical facts, and reviews de novo the court's application of the law.  **Rayford v. State**,

51

125 S.W.3d 521, 528 (Tex. Crim. App. 2003)   Appellate review of an affidavit in support of a search warrant, however, is not de novo.

Rather, great deference is given to the magistrate's determination of probable cause.  **Illinois v. Gates,** 462 U.S. 213, 236-37, 103 S.Ct. 2317, 2331, 76 L.Ed. 2d 334 (1983)

The test for determination of probable cause is whether the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing.  **State v. Stone**, 137 S.W. 3d 167, 174 (Tex. App. – Houston [1st Dist.] 2004, pet. ref'd)  The affidavit which supports the search warrant must contain the following facts to justify issuance of a search warrant:  (1)  a specific offense has been committed, (2) specifically described property or items to be searched for and seized constitute evidence of the offense, (3) the property or items constituting such evidence is located at the particular place to be searched.  Tex. Code Crim. Proc. Art. 18.01(c) (West 2014) "Whether the facts mentioned in the affidavit are adequate to establish probable cause depends on the totality of the circumstances.  **Stone**, at 175. "Probable cause exists if, under the totality of the circumstances set forth in the affidavit before the magistrate, there is a "fair probability" that

contraband or evidence will be found in a particular place at the time the warrant is issued.  **State v. Jordan**, 342 S.W.3d 565, 568 (Tex. Crim. App. 2011) Courts decide whether probable cause existed to issue a warrant based on the "four corners" of the affidavit in support of the warrant.  **Jones v. State**, 833 S.W.2d 118, 123 (Tex. Crim. App. 1992) "A mere conclusory statement gives the magistrate virtually no basis at all for making a judgment regarding probable cause."  **Serrano v. State**, 123 S.W.3d 57, 60 (Tex. App. – Austin 2003, pet. ref'd)

At the suppression hearing, the trial court admitted 2 Affidavits executed by Investigator Roberts in support of his search of Appellant's DNA and her cell phone.  (R.R. Supp. at 5)  Roberts testified that both affidavits set out the same facts although they were prepared on different dates.  (R.R. Supp. at 22)  Appellant contends that a review of both Affidavits for Search Warrant do not provide sufficient facts that give a fair probability that evidence would be found from Appellant's DNA or from her cell phone concerning the investigation of Tony's murder.  Virtually every sentence in the affidavits concerned the criminal activity of Sutton, Jr. such as his shooting of his father or the assault of Appellant.

In fact, the affidavits never mentioned that Appellant participated in the murder and only mentioned that Sutton, Jr., shot his father. Appellant contends that Roberts' statements are mere conclusory statements concerning Appellant which do not rise to the level of probable cause for the issuance of a warrant. Humaran asserts that the affidavits fail the second provision of Article 18.01(c) of the Texas Code of Criminal Procedure because Roberts failed to explain how her DNA constituted evidence of the murder. Based on this, the totality of the circumstances showed that the affidavits lacked probable cause for the issuance of a search warrant. Therefore, the trial erred in denying Appellant's Motions to Suppress.

# POINT OF ERROR NO. 4

## TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR A MISTRIAL CONCERNING PROSECUTOR'S COMMENT ON APPELLANT'S FAILURE TO TESTIFY

Appellant contends that during the State's cross-examination of the Defense's sole punishment witness, the prosecutor's line of questioning was a comment on the Appellant's failure to testify.  The State's cross-examination is set out as follows:

Q:    And is it your testimony that this person deserves the minimum, somewhere around the minimum?
A:    Yes.
Q:    All right.  And is it your testimony that she was not capable of committing this crime without Clinton Sutton, Jr.?
A:    Yes.
Q:    That's your testimony to the jury?
A:    Yes.
Q:    And what's that based on?
A:    Well, part of it is the offense report and she - - she cared about his father.
Q:    According to her?
A:    Yes.
Q:    What, if anything, did she tell you about, I guess, wanting to sell Tony's property, the victim's property?
A:    I know that's an allegation.  She - - we did not discuss that.  I saw--.
Q:    You didn't discuss that?
A:    I saw that in the offense report.
Q:    But you didn't think that was pertinent to you-all's discussion?
A:    No.
Q:    Why?

A:     Because, again, I'm focusing on her and I didn't go into the facts of the case.

Q:     Well, I mean, fair - - wouldn't it be fair to say that the jury has got to – they've got to assess punishment and the facts of this case kind of matter?  Wouldn't that - -

A:     They've heard all of the facts of the case.  They've heard all of the testimony.

Q:     As so, it seems like your conversations with the defendant focus on everything but the crime.

MR. GUERRA:   Your Honor, that's argumentative, Your Honor; and it's badgering the witness.

THE COURT:     Rephrase it, please.

Q:     Would it be fair to say that your involvement in this case and your conversations with her pretty much involve everything but the crime?

MR. GUERRA:   That's been asked and answered over and over.

THE COURT:     Sustained.

Q:     Are you asking this jury to overlook the crime?

A:     No.  They've heard the testimony of the crime.  What I am saying is that my purpose is to try to explain to the jury a little bit about her and I interviewed her about her background. They've—they've heard more—well, they've heard the testimony.  I haven't.

Q:     Right.  Fair to say, I mean, they are in a better position to assess it than you are certainly?

A:     No.

Q:     They're not?

A:     Well, obviously, they are.  They're the jury.  But I'm just saying I am here to give them a better picture of her, not to go into the details of the offense.

Q:     And that better picture is based on your three interviews only with her?

A:     And her family.

Q:     And her family.  And when you say give the jury a better picture of her, what is – what's – what's the picture we're talking about?

A:     Just-- I can—read her growing up, a summary that her mom helped me with you want me to do that.

Q:     Well, we can't do that because it's—it's not admissible in evidence.  But fair to say that that's pretty one-sided?

A:     Well, of course.

Q:	Yeah.
	MR. CLAYTON:  I'll pass the witness.

(R.R. Vol. 15 at 64-67)

The trial court denied Appellant's motion for a mistrial.  (R.R. Vol. 15 at 69)

"To violate appellant's constitutional and statutory rights, the objectionable comment, viewed from the jury's perspective, must be manifestly intended to be or of such a character that the jury would necessarily and naturally take it as a comment on the accused failure to testify."  **Fuentes v. State**, 991 S.W.2d 267, 275 (Tex. Crim. App. 1999) "Calling attention to the absence of evidence which only the defendant could produce will result in a reversal only if the remark can only be construed to refer to appellant's failure to testify and not the defense's failure to produce evidence."  **Fuentes**, at 275.

Appellant contends that the prosecutor commented on Appellant's failure to testify by repeatedly asking Schultz her reasons for not discussing Tony's killing with Appellant.  Schultz clearly testified that she limited her interviews with Appellant to focus on the positive aspects of her life for the purpose of sentencing before a jury.  Despite Schultz's

57

repeated assertions that she did not discuss the facts of Tony's killing with Appellant, the prosecutor continued to focus his questions on Schultz's failure to obtain Appellant's version of Tony's killing. This continued focus on an absence of Appellant's version of the killing was a comment on Appellant's failure to testify. The prosecutor's comments were so inflammatory that the prejudicial effect could not have been erased from the jury's mind. Therefore, the trial court erred in denying Appellant's request for a mistrial.

# POINT OF ERROR NO. 5

## THE TRIAL COURT ERRED BY DENYING
## APPELLANT'S MOTION FOR CONTINUANCE

On May 6, 2014, the day after a jury had been chosen, Appellant made an oral Motion for Continuance before the trial court because of the death by suicide of Sutton, Jr. (RR. Vol. 3 at 6) Appellant claimed that she needed additional time to investigate the suicide of Sutton, Jr., to determine if he left a suicide not in which he accepted responsibility for the death of his father. (R.R. Vol. 3 at 6) Appellant claimed that the denial of a continuance would violate her Sixth Amendments right to effective representation under the United States Constitution. (R.R. Vol. 3 at 6) The trial court denied Appellant's motion for continuance. (R.R. Vol. 3 at 13) Appellant filed a sworn written motion for continuance on May 7, 2014. (TR. Vol. 3 at 128)

"The granting or denying of a motion for continuance is within the sound discretion of the trial court. A defendant must show specific prejudice to his defense to establish that the trial court abused its discretion in refusing to grant a continuance." **Renteria v. State**, 206 S.W.3d 689 (Tex. Crim. App. 2006)

Appellant contends that her defense would be prejudiced by a denial of the continuance because she would not have time to fully investigate Sutton, Jr.'s death and any of his personal writings he may have left behind in his prison cell.  Appellant asserts that Sutton, Jr., may have written a suicide note in which he accepted full responsibility for the death of his father.  Moreover, any of his personal writings may provide additional evidence with which to confront and cross-examine the numerous State witnesses called for trial.  Denying the continuance violated Appellant's right to an effective representation.  Based on this prejudice, Appellant contends that the trial court abused its discretion in denying her motion for continuance.

**POINT OF ERROR NO. 6**


**THE TRIAL COURT ERRED IN DENYING APPELLANT'S REQUESTED CHANGES TO THE JURY CHARGE IN THE GUILT-INNONCENCE PHASE OF THE TRIAL**


At the close of evidence, Appellant requested instructions for the issues of Necessity and Duress to be included in the jury charge. (R.R. Vol. 12 at 88) The trial court denied Appellant's request. (R.R. Vol. 12 at 88)

"In analyzing a jury-charge issue, we first determine if error occurred and, if so, we conduct a harm analysis. A jury-charge error requires reversal when, after proper objection, the appellant suffers "some harm" to his rights. **Ngo v. State**, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) An accused has the right to an instruction on any defensive issue raised by the evidence, whether the evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense. **Granger v. State**, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999)

The defense of duress applies when a defendant is engaged in the proscribed conduct because he was compelled to do so by threat of

imminent death or serious bodily injury to himself.  **Tex. Pen. Code, Section 8.05(a) (West 2014)** The defense of necessity requires a showing that (1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm, (2) the desirability and urgency of avoiding the harm clearly outweighs, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct, and (3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear. **Tex. Pen. Code, Section 9.22 (West 2014)**

The affirmative defenses of duress and necessity are a justification defense because the defense does not negate any element of the offense, but only excuses what would be otherwise criminal conduct. **Gomez v. State**, 380 S.W.3d 830, 834 (Tex. Crim. App. 2013) Duress and necessity require that Appellant first admit to all the elements of the underlying offense and then claim that his commission of the offense was justified because of other facts.  **Gomez**, at 834.

While Appellant may not have admitted to shooting Tony to Captain Kincheloe , Deputy West, or Deputy Beaver, the State claimed she made the admission in her 9-1-1 call   Appellant contends this

62

admission combined with the fact that shooting a person in the shoulder with an AK-47 is an act clearly dangerous to human life, provided more than enough proof to include Duress and Necessity instructions in the jury charge. The testimony of Captain Kincheloe, Deputy Thomas, Deputy Beaver, and the Robinsons provided ample evidence that Sutton, Jr., had assaulted and possibly raped Appellant and forced her to participate in his father's murder and its subsequent cover up. Based on this evidence, it was for the jury to decide whether or not to believe her testimony fell under the affirmative defenses of duress or necessity. Therefore, the trial court erred in denying Appellant's requested instructions of duress and necessity to the jury charge.

**THE TRIAL COURT ERRED BY EXCLUDING EVIDENCE OF
CLINTON ANTHONY SUTTON, JR.'s SUICIDE**

Appellant attempted to introduce evidence of Sutton, Jr.'s suicide on May 5, 2014, to show his culpable mental state of mind as the principal party in his father's death and to aid the jury in assessing an appropriate punishment. (R.R. Vol. 15 at 23) The trial court sustained the prosecutor's objection that court's ruling would be misleading to the jury and was not relevant to this proceeding. (R.R. Vol. 15 at 23-24) Appellant contends that Sutton, Jr.'s suicide on the first day of Appellant's trial was relevant to the issue of Appellant's punishment.

An appellate court reviews a trial court's decision to admit or exclude evidence over objection under an abuse of discretion standard and will not reverse that decision absent a clear abuse of discretion. **McCarty v. State**, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008) The trial court abuses its discretion when the decision lies outside of the zone of reasonable disagreement. **Id.**, at 239. Relevant evidence means evidence having any tendency to make the existence of any fact that is of

consequence to the determination of the action more probable or less probable than it would be without the evidence. **Tex. Rules Of Evid.** 401 (West 2014) "All relevant evidence is admissible, except as otherwise provided by Constitution, by statute, by these rules, or by other rules prescribed pursuant to statutory authority." **Tex. Rules Of Evid.** 402 (West 2014)

Article 37.07, Section 3(a)(1) of the Texas Code of Criminal Procedure provides that "evidence may be offered by the state or defendant as to any matter the court deems relevant to sentencing…" (West 2014) Appellant contends that Sutton, Jr.'s suicide is relevant as mitigating evidence for the jury to consider. Evidence is relevant to assessing punishment if it helps the fact finder decide what sentence is appropriate for a particular defendant given the facts of the case. **Hayden v. State**, 296 S.W.3d 549 (Tex. Crim. App. 2009) Evidence of mitigating circumstances such as evidence that a juror might regard as reducing a defendant's moral blameworthiness may be considered by the jury when deliberating punishment. **Willingham v. State**, 897 S.W.2d 351, 359 (Tex. Crim. App. 1995)

Appellant contends that the trial court abused its discretion by excluding evidence of Sutton, Jr.'s suicide because evidence of his death on Appellant's first day of trial would have shown Sutton, Jr.'s culpable mental state by his final act of taking responsibility for the killing of his father. Appellant argues that evidence of his suicide would not have misled the jury by forcing the jury to speculate on the true motive behind Sutton, Jr.'s suicide.

In fact, Appellant contends that evidence of Sutton, Jr.'s suicide is relevant to mitigate her punishment because his suicide on the eve of trial of the mother of his son, James Gabriel, demonstrated that Sutton, Jr., played a greater role than Appellant in his father's killing. Thus, Sutton, Jr.'s remorse over his greater role in Tony's death prompted his suicide, on the eve of Appellant's trial, as a message to the world of his greater responsibility.

Appellant argues that it was no accident that Sutton, Jr., took his own life on the eve of Appellant's trial. Excluding this dying declaration from the jury was an abuse of discretion. Therefore, the trial court abused its discretion by excluding evidence of Sutton, Jr.'s suicide.

# POINT OF ERROR NO. 8

## THE TRIAL COURT ERRED BY ADMITTING EXPERT TESTIMONY OF HALLIMORE ABOUT CONTENTS OF THE ENHANCED 9-1-1 CALL

During the examination of Sergeant Hallimore, the trial court held a hearing outside the presence of the jury on Appellant's request to disqualify Hallimore as an expert witness who would testify about the contents of an enhanced version of the 9-1-1 call previously admitted into evidence.  (R.R. Vol. 3 at 232)

Hallimore testified that he has enhanced audiotapes to clarify poor recordings for 18 years.  (R.R. Vol. 3 at 238)  He explained that he uses software called "Sony Sound Forge Pro" and "Sound Soap" to enhance 9-1-1 recordings.  (R.R. Vol. 3 at 240)  Hallimore testified that he has used this software for over 10 years, but he has not received any formal training on its operation.  (R.R. Vol. 3 at 241)  On cross-examination, Hallimore admitted that he purchased both software packages at a local retail store and taught himself how to use the programs.  (R.R. Vol. 3 at 244-247)  He admitted that he did not know if Sony had any formal training program for the operation of the software.  (R.R. Vol. 3 at 250)

Appellant objected to Hallimore's testimony because his formal training on the enhancement software did not meet the requirements of Rule 702 of the Texas Rules of Evidence to be considered expert testimony. (R.R. Vol. 3 at 252) The trial court overruled Appellant's objection. (R.R. Vol. 3 at 252)

The appellate court reviews a trial court's ruling on a motion to suppress evidence for an abuse of discretion. **State v. Dixon**, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006) At a suppression hearing, the trial court is the sole and exclusive trier of fact and judge of credibility of the witnesses, as well as the weight to be given their testimony. **Romero v. State**, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990) In reviewing a trial court's ruling on the motion to suppress, the appellate court gives almost total deference to a trial court's determination of historical facts, and reviews de novo the court's application of the law. **Rayford v. State**, 125 S.W.3d 521, 528 (Tex. Crim. App. 2003)

Admission of expert testimony is governed by **Texas Rule of Evidence** 702. This rule of evidence provides the following:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to

determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

**Tex. Rule Of Evid.** 702 (West 2011)

Before admitting expert testimony under Rule 702, the trial court must be satisfied that 3 conditions are met:  1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education, 2) the subject matter of the testimony is an appropriate one for expert testimony, and 3) admitting the expert testimony will actually assist the fact finder in deciding the case.  **Davis v. State**, 329 S.W.3d 798, 813 (Tex. Crim. App. 2010).  These conditions are commonly referred to as 1) qualification, 2) reliability, and 3) relevance.  **Vela v. State**, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006)  Absent a clear abuse of discretion, a trial court's decision to admit or exclude expert testimony will not be disturbed.  **Wyatt v. State**, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000)

### QUALIFICATIONS

Qualification is a two-step inquiry:  1) whether the witness has a sufficient background in a particular field and 2) whether that background

goes to the matter on which the witness is to give an opinion. **Davis**, at 813. Appellant contends that Hallimore lacked the qualifications to testify about the enhancement of the 9-1-1 recording even though he testified that he has enhanced recordings for 18 years because of his lack of formal training on the software. Hallimore admitted that he not has received any training on the operation of the enhancement software from Sony. (R.R. Vol. 3 at 250) Appellant asserts that using software purchased from a retail store like "Best Buy" and following its directions does not qualify Hallimore to testify as an expert. His opinion about the contents of the enhanced recordings would be no better than anyone else's opinion who used the store bought software. Hallimore's testimony would provide a level unquestioned knowledge to the jury which was not deserved. The jury was best served to listen to the tape themselves without the opinion of a witness whose lack of formal training did not merit an expert qualification. Therefore, Hallimore's opinion was nothing more than guesswork which does not rise to the level of expert testimony set out in Rule 702.

## RELIABIILITY & RELEVANCE

Appellant contends that Hallimore's testimony as an expert was not reliable because he had not obtained any more knowledge than an ordinary citizen who would use this store bought software in order to give an opinion as to a statement made on an enhanced recording. Since his opinion about the content of the enhanced recording is no better than a lay person, Hallimore's opinion is also not relevant. Therefore, Appellant contends that Hallimore's testimony about the contents of the enhanced recording are unreliable and irrelevant. Therefore, the trial court erred by allowing Hallimore to testify as an expert witness on the contents of the recording of the enhanced 9-1-1 call.

## CONCLUSION

For the reasons stated, Appellant Humaran prays the Court to reverse and acquit or in the alternative to reverse and remand this cause for a new trial.

Respectfully submitted,

_/s/ Crespin Michael Linton_
Crespin Michael Linton
440 Louisiana, Suite 900
Houston, Texas  77002
Texas Bar No.  12392850
(713) 236-1319
(713) 236-1242 (Fax)

## CERTIFICATE OF COMPLIANCE

I hereby certify that Appellant's Brief, as calculated under Texas Appellate Rule of Appellate Procedure 9.4, contains 14,872 words as determined by the Word program used to prepare this document.

_/s/ Crespin Michael Linton
Crespin Michael Linton

## CERTIFICATE OF SERVICE

I do hereby certify that on this the 23[th] day of February, 2015, a true and correct copy of the foregoing Appellant's Brief was served by E-service in compliance with Local Rule 4 of the Court of Appeals or was served in compliance with Article 9.5 of the Rules of Appellate Procedure delivered to the Assistant District Attorney of Brazoria County, Texas, 111 East Locust Street, 4th Floor Angleton, Texas 77515 at davidb@brazoria-county.com.

__/s/_ Crespin Michael Linton__
Crespin Michael Linton